Robert J. HAUBOLDT, Plaintiff-Respondent-Cross Appellant,

Holly D. HAUBOLDT, Plaintiff-Respondent,

EMPLOYERS INSURANCE OF WAUSAU, a mutual company, Impleaded-Plaintiff-Cross Respondent,

v.

UNION CARBIDE CORPORATION and Bentley Superior Bradshaw Welding Supply, Defendants-Appellants,

LINDE UNION CARBIDE, Defendant,

Ruth COLEMAN, Third Party Defendant,

Thomas COLEMAN and American Family Insurance Company, Third Party Defendants-Respondents.

Supreme Court

*No. 89-1525. Argued January 3, 1991.—Decided April 2, 1991.*

(Also reported in 467 N.W.2d 508.)

663

665

For the defendants-appellants there were briefs (in the court of appeals) by *Pamela H. Schaefer, Kevin J. Lyons* and *Cooke & Franke, S.C.* and *David J. Hase, Richard M. Esenberg, Lisa A. Olson* and *Foley & Lardner,* all of Milwaukee and oral argument by *Mr. Hase.*

For the plaintiff-respondent-cross appellant there were briefs (in the court of appeals) by *John K. Brendel,* Brookfield and oral argument by *John K. Brendel.*

For the impleaded-plaintiff-cross respondent, there was a brief (in the court of appeals) by *Peter L. Topczewski* and *Straub & Schuch Law Offices,* Milwaukee and oral argument by *Mr. Topczewski.*

CALLOW, WILLIAM G., J. This case is before this court on certification from the court of appeals pursuant to sec. (Rule) 809.61, Stats. The defendants-appellants Union Carbide Corporation and Bentley Superior Bradshaw Welding Supply (Union Carbide) appeal from a judgment for the plaintiff-respondent-cross appellant (Hauboldt) entered by the circuit court for Milwaukee county, Judge Michael P. Sullivan.

Union Carbide raises two issues on appeal. First, Union Carbide contends that the circuit court erred when it did not apply the "firefighter's rule"[1] to immu-

---

[1] We agree with the Supreme Court of Rhode Island which has changed the name of this rule from the "fireman's rule" to the "firefighter's rule." *Mignone v. Fieldcrest Mills,* 556 A.2d 35, 37 n.1 (R.I. 1989). Because the position of firefighter is not restricted to men, we find no justification for continuing to refer to this legal doctrine as the "fireman's rule."

nize Union Carbide from liability to a firefighter injured by the explosion of a defective acetylene tank manufactured by Union Carbide. Second, Union Carbide contends that the circuit court improperly excluded evidence of the landowner's or occupier's negligence, thus hindering its defense against Hauboldt's claim of product defect, and obstructing its claim for contribution against the land occupier (Coleman).

The firefighter Hauboldt raises a third issue as cross-appellant. Hauboldt contends that the circuit court improperly awarded interest to the impleaded plaintiff, cross-respondent Employers Insurance of Wausau (Employers). Hauboldt alleges that sec. 102.29, Stats. 1987–88,[2] only allows employers a right to reimbursement for monies paid to Hauboldt as compensation benefits, and does not provide for interest on those benefits.

We first conclude that Union Carbide is not entitled to the protection of the firefighter's rule. Public policy considerations support the application of this rule to landowners or occupiers whose negligence starts or fails to curtail a fire. However, no policy reasons support its application to manufacturers whose defective product injures a firefighter during the course of a fire (as opposed to a defective product which starts or contributes to the spread of the fire) when the danger caused by the defective product is not reasonably apparent or one not anticipated by the firefighter. We next conclude that the circuit court did not err in refusing to admit evidence of Coleman's negligence in constructing, maintaining and using the garage where the fire started and the acetylene tank was located. Finally, we conclude that the circuit court did not err in awarding interest at the rate of 12 percent on the compensation reimbursement to

---

[2] All further statutory references are to the 1987–88 statutes, unless otherwise indicated.

which Employers was entitled. Because Employers was a party to the judgment it is entitled to interest on its portion of the award.

The relevant facts follow. Thomas Coleman (Coleman) repaired and painted automobiles in the garage of the house in which he lived. He shared the house with the third-party defendant, his mother Ruth Coleman. Ruth Coleman owned the house. In the garage, Coleman kept flammable painting chemicals, oxygen and acetylene in industrial-sized tanks, and other materials he used to repair automobiles and snowplow blades.

On the morning of January 8, 1983, a woodburning furnace which Coleman used to heat his garage started a fire. The fire ignited spilled gasoline and spread, causing other containers of flammable substances to explode. Ultimately, the fire reached the tanks, causing the oxygen tank to release its contents, and causing the acetylene tank manufactured by Union Carbide to explode.

Ruth Coleman called the Brookfield Fire Department after the fire started, but before the acetylene tank exploded. Police officers responding to the call asked Coleman if there were sealed containers or other items in the garage that might explode. Coleman responded that, "there was some paint thinner and a gas tank." Shortly after this, the fire department arrived to fight the fire. Coleman did not tell the firefighters about the acetylene tank in the garage.

As the firefighters attempted to extinguish the fire with water, the acetylene tank exploded, hurling Hauboldt forty-two feet through the air and into a parked car. This collision injured Hauboldt's back, neck and shoulder.

The acetylene tank was equipped with safety devices (fusible plugs) designed to melt in the event of a fire, to allow the tank to release the acetylene gas before

668

it exploded. The tank's design had been tested, and was consistent with government standards.

Hauboldt sued Union Carbide and its agents on the grounds that the acetylene tank was negligently manufactured and was inherently dangerous, making Union Carbide strictly liable for Hauboldt's injuries. Employers was impleaded as a plaintiff because it had made medical and disability payments to Hauboldt pursuant to the worker's compensation laws of Wisconsin, and was entitled to reimbursement under sec. 102.29, Stats.[3] Union Carbide filed a third-party action against the Colemans,

---

[3]Section 102.29(1), Stats., provides, in part:

**Third party liability.** **(1)** The making of a claim for compensation against an employer or compensation insurer for the injury or death of an employe shall not affect the right of the employe, the employe's personal representative, or other person entitled to bring action, to make claim or maintain an action in tort against any other party for such injury or death, hereinafter referred to as a 3rd party . . .. The employer or compensation insurer who shall have paid or is obligated to pay a lawful claim under this chapter shall have the same right to make claim or maintain an action in tort against any other party for such injury or death. However, each shall give to the other reasonable notice and opportunity to join in the making of such claim or the instituting of an action and to be represented by counsel . . .. Each shall have an equal voice in the prosecution of said claim, and any disputes arising shall be passed upon by the court before whom the case is pending, and if no action is pending, then by a court of record or by the department. If notice is given as provided in this subsection, the liability of the tortfeasor shall be determined as to all parties having a right to make claim, and irrespective of whether or not all parties join in prosecuting such claim, the proceeds of such claim shall be divided as follows: After deducting the reasonable cost of collection, one-third of the remainder shall in any event be paid to the injured employe or the employe's personal representative or other person entitled to bring action. Out of the balance remaining, the employer or insurance carrier shall be reimbursed for all payments made by it, or which it may be obligated to make in the future, under this chapter, except that it shall not be reimbursed for any payments of increased compensation made or to be made under s. 102.18(1)(bp), 102.22, 102.35(3), 102.57 or 102.60. Any balance

claiming contribution or indemnification on the basis of their negligent use and storage of the acetylene tank.

The circuit court denied Union Carbide's motion for summary judgment, finding that the firefighter's rule did not apply to the manufacturer of a product which "aggravated the hazard." The circuit court also granted Hauboldt's motion to prohibit Union Carbide from introducing testimony related to Coleman's negligence in causing the start of the fire and creating the conditions under which it spread (e.g., evidence of code violations).

During the trial, Union Carbide presented evidence to support its theory that a "hot spot" on the tank caused the explosion, rather than a defect. Union Carbide claimed that when the oxygen tank next to the acetylene tank released its contents the fire magnified in intensity, creating a "hot spot" on the acetylene tank and causing it to explode before the fusible plugs could melt as they were designed.

Consistent with its rulings during the trial, the circuit court rejected Union Carbide's requested verdict and jury instructions concerning Coleman's negligence (other than his failure to warn) and submitted to the jury the question of Coleman's failure to warn the police officers and firefighters. The jury found Union Carbide 88 percent causally negligent, finding that the tank was defective and unreasonably dangerous when it left Union Carbide, and that Union Carbide was causally negligent in designing or manufacturing the tank and in failing to warn of the explosive nature of the tank. The jury found Coleman 12 percent causally negligent for his failure to warn the firefighters of the presence of the tank. The jury assessed damages against Union Carbide for

remaining shall be paid to the employe or the employe's personal representative or other person entitled to bring action.

670

$1,011,000 for injuries to Hauboldt and $25,000 for loss of consortium for his wife.

In its judgment, the circuit court affirmed the jury's holding, and divided the award according to the formula in sec. 102.29(1), Stats. In addition to the reimbursement due Employers ($104,017.66), the court awarded Employers post-judgment interest on this amount at the rate of 12 percent.

The parties appealed this holding. The court of appeals certified this case to us for review and determination pursuant to sec. (Rule) 809.61, Stats.

## I.

The earliest Wisconsin case to address the firefighter's rule was *Hass v. Chicago & N.W. Ry.,* 48 Wis. 2d 321, 179 N.W.2d 885 (1970). In *Hass,* we explicitly stated that a tort-feasor's liability was not predicated on his or her position as an owner or proprietor of the premises. *Hass,* 48 Wis. 2d at 323. In *Hass,* we applied a traditional negligence analysis to a situation where a volunteer firefighter was seriously injured in the course of his duties while fighting a fire caused by the defendant railroad company. *Id.* at 323–27. Since we were addressing a circuit court order overruling a demurrer of the defendant, we concluded that, for purposes of the demurrer, negligence existed and it was a "substantial factor" in causing the injuries. *Id.* at 326.

Recognizing that a large proportion of home and industrial fires were occasioned by negligence, we stated:

> negligence plus an unbroken sequence of events establishing cause-in-fact does not necessarily lead to a determination that the defendant is liable for the plaintiff's injuries. The determination to not impose liability in instances where a negligent act has been

> committed and the act is a "substantial factor" in causing the injury rests upon considerations of public policy.

*Id.* These public policy considerations led to the conclusions that imposing liability would place too great a burden on homeowners and other occupiers of real estate, and would permit the law of negligence to "enter a field that has no sensible or just stopping point." *Id.* at 327. Based on these public policy considerations, we held that one who negligently starts or fails to curtail the spread of a fire that causes injury to a responding firefighter is immune from liability. *Id.*

In *Clark v. Corby*, 75 Wis. 2d 292, 249 N.W.2d 567 (1977), we addressed an issue not raised in *Hass:* whether a landowner or occupier had a duty to warn firefighters of hidden hazards known to the landowner or occupier but not to the firefighter. *Clark*, 75 Wis. 2d at 296. We concluded that such a duty existed where an opportunity was presented for the landowner or occupier to warn the firefighter of the hidden hazard. *Id.* at 298. We also recognized that the standard of ordinary negligence was applicable to such a scenario, and stated that the duty to warn of unusual hazards was an element of ordinary negligence. *Id.* at 297 n.6 (where we applied the standard of ordinary negligence mandated by *Antoniewicz v. Reszczynski,* 70 Wis. 2d 836, 236 N.W.2d 1 (1975)).

██ We addressed this duty of ordinary care in *Wright v. Coleman,* 148 Wis. 2d 897, 436 N.W.2d 864 (1989), a case which arose from the same fire as this case. In *Wright,* we stated that the general rule of negligence was as we stated in *Clark* and *Antoniewicz:* the landowner or occupier is negligent when he or she fails to warn if, under the circumstances, it would be reasonable to warn.

*Wright,* 148 Wis. 2d at 907. We did not limit liability for a failure to warn as a matter of public policy. *Id.* We stated that the "exception is *Hass,* where we have held, as a matter of policy, that a firefighter may not recover from a landowner or occupier who has been negligent only in starting or failing to curtail the fire. This is Wisconsin's version of the fireman's rule." *Id.* Hence, in *Wright,* we recognized the "firefighter's rule" as nothing more than a limited exception to the general rule of liability for negligence, immunizing landowners or occupiers who negligently start a fire or negligently fail to curtail its spread. *Id.* at 902.

■

In *Clark,* we were unable to find public policy considerations sufficient to justify expanding this exception to expose firefighters to the added risks of hidden hazards known to the landowner. *Clark,* 75 Wis. 2d at 298. Likewise, in *Wright,* we refused to limit the landowner's or occupier's duty to warning only of hidden hazards, stating that a landowner or occupier had a duty to warn of known hazards, if a reasonable person in the circumstance would have done so. *Wright,* 148 Wis. 2d at 909. The history of the firefighter's rule illustrates the fact that we have addressed the rule as an exception to the general duty of care law. *See Antoniewicz,* 70 Wis. 2d at 857. While in *Hass,* we discerned adequate policy reasons for creating an exception to the general rules, we were unable to find justification for expanding the exception to encompass the situations described in *Clark* and *Wright.* For the same reason, we will not expand the firefighter's rule to cover manufacturers whose defective product directly causes injury to firefighters during the course of a fire, when the danger caused by the defective product is not reasonably apparent to them, or a risk anticipated by them.

Union Carbide argues that the exception should be applicable to a manufacturer whose product starts or contributes to a fire. Union Carbide contends that there should not be an arbitrary distinction drawn between landowners and manufacturers under such circumstances. Union Carbide analogizes this case to cases from other jurisdictions to support its proposition that it should be protected by the firefighter's rule. *See, e.g., Mignone,* 556 A.2d 35 (firefighter's rule barred recovery from a manufacturer whose faulty electric blanket started a fire); *Mahoney v. Carus Chemical Co.,* 102 N.J. 564, 510 A.2d 4 (1986) (firefighter's rule applicable to fires started by defective products); *Brown v. General Electric Corp.,* 648 F. Supp. 470 (M.D. Ga. 1986) (firefighter's rule barred recovery from the manufacturer of a defective coffee maker which started a fire).

In this case, the manufacturer's defective product did not merely start or contribute to a fire. Although we have framed the firefighter's rule as protecting landowners and occupiers, the fact that Union Carbide was not a landowner or occupier does not determine this case. In this case, the firefighter was directly injured by the unexpected explosion of a defective acetylene tank, not by fire or structural damage incidentally resulting from this explosion. The firefighter was injured by an event that he did not have an opportunity to prepare for. In this sense, the firefighter was in the same position as any other individual injured by a defective product. It is not logical to expand the firefighter's rule to immunize product manufacturers simply because the defective product happens to injure a firefighter in the course of a fire, where the danger caused by the defective product is not reasonably apparent to the firefighter, or anticipated by the firefighter.

Several cases have held that the manufacturer of a defective product is protected by the firefighter's rule even though the firefighter was directly injured or killed because of the product's defect. *See, e.g., Flowers v. Rock Creek Terrace Ltd. Partnership,* 308 Md. 432, 520 A.2d 361 (1987) (firefighter injured by fall into an open elevator shaft); *Armstrong v. Mailand,* 284 N.W.2d 343 (Minn. 1979) (firefighters killed by the explosion of a defective liquified petroleum tank). These cases are readily distinguishable from this case. In *Armstrong* and *Flowers,* the courts were careful to explain that the dangers were "reasonably apparent," or an "anticipated risk" within the range of the firefighters' duties. *Flowers,* 520 A.2d at 370; *Armstrong,* 284 N.W.2d at 352–53. Such is not the case here, as the danger of an exploding acetylene tank was not an anticipated risk, or reasonably apparent to the firefighters.

None of the public policies served by the firefighter's rule would be served by an extension of the firefighter's rule to cover manufacturers in this situation. *Hass* stated that allowing recovery was likely to "place too great a burden upon homeowners, and other occupiers of real estate." *Hass,* 48 Wis. 2d at 327. The rationale behind this principle is that since a large proportion of fires are started by the negligence of the landowner or occupier, it would be unreasonable to make the landowner or occupier respond in damages to the firefighter who is employed and trained for the purpose of fighting such fires. This rationale does not apply to manufacturers of defective products which directly injure firefighters who are not prepared for the danger the defective product presents. Imposing liability where a product, because of a defectively designed or manufactured safety device, explodes in a fire and injures a firefighter is no different from imposing liability for injuries caused by

other defective products. The burden on the manufacturer is the same.

Union Carbide argues that to allow recovery against manufacturers would also permit the law of negligence to "enter a field that has no sensible or just stopping point." *Id.* Union Carbide contends that allowing recovery in this situation would predicate immunity from liability on fortuitous circumstances such as whether the product manufacturer owns the property where the accident occurs. On the contrary, holding Union Carbide liable under these circumstances (where Union Carbide is not the landowner and its defective product directly causes the injury) actually preserves the sensible and just stopping point we have established through our earlier cases. Allowing Union Carbide to be protected by the firefighter's rule in this situation would open the door to expansive immunity from liability for manufacturers whose defective products injure firefighters while they fight a fire in the vicinity of the product, unaware of the danger posed by the defective product. This was not the intent of the firefighter's rule.

Other policies are also not served by extending the firefighter's rule in this situation. While "fundamental concepts of justice prohibit a firefighter from complaining about the negligence that creates the very need for his or her employment," *Mignone,* 556 A.2d at 39, such is not the case here. Had Hauboldt sued the manufacturer of the woodburning furnace which started the fire, alleging that the stove was defective, the facts of this case would be similar to those in *Mignone* (where a faulty electric blanket started the fire). In this case, the acetylene tank did not start the fire, but rather exploded during the fire as a result of defective safety devices, directly injuring Hauboldt. The defective product in this case did not "create the very need for his [employment]."

676

The *Mignone* court also stated that since the citizens had already been taxed once in order to compensate firefighters for their injuries, it would be fundamentally inconsistent with public policy to require an individual to compensate the firefighter a second time in tort for those same injuries. *Id.* While this policy reason can arguably apply to Union Carbide as a taxpayer, it is not as persuasive. Firefighters are hired to fight fires, not to confront defective acetylene tanks. Just as a landowner is liable for negligence unrelated to "starting or failing to curtail the spread of a fire," *see Wright,* 148 Wis. 2d at 907, the fact that Union Carbide is a taxpayer should not limit its liability in this instance.

On the contrary, the policy to be promoted by strict liability is the protection of otherwise defenseless victims of defectively manufactured products. *Fish v. Amsted Indus., Inc.,* 126 Wis. 2d 293, 305, 376 N.W.2d 820 (1985). The purpose of strict products liability is to ensure that the costs of injuries resulting from the use of a defective product are borne by the manufacturer who placed the defective product on the market, rather than by the injured person. *Fish,* 126 Wis. 2d at 304. *See also Court v. Grzelinski,* 72 Ill. 2d 141, 379 N.E.2d 281, 285 (1978) ("[P]ublic policy demands that responsibility be fixed wherever it will most effectively reduce the hazards to life and health inherent in defective products that reach the market."). As in products liability cases generally, Union Carbide is in the best position to identify and correct defects in its manufactured products. Rather than furthering these policy goals, providing immunity to Union Carbide under these circumstances would frustrate these goals.

677

## II.

Union Carbide next argues that by excluding evidence of Coleman's negligence, the circuit court improperly restricted Union Carbide's defense against Hauboldt's claims of product defect, and in proving its claim for contribution against Coleman. The circuit court addressed the issues of Coleman's negligence in creating the conditions leading to the fire spreading, and his possible code violations repeatedly during the trial. The circuit court judge expressed his rationale for excluding such evidence during the trial:

> [b]ut it seems to me that . . . the only thing he can be responsible for, whether it's to him, the plaintiff or by way of contribution, is the negligence that is actionable under the law, and the negligence of his that is actionable under the law in light of this "fireman's" thing is not negligence that goes to the starting of the fire, unless you can show me that you've got one of those exceptions that's been carved out of the "fireman's rule" . . . .. Believe me, I understand that this puts Union Carbide in a very different position because ordinarily if the man was not a fireman, it would be the typical negligence.

In addressing Union Carbide's concern that Coleman's negligence went beyond "starting or failing to curtail the spread" of the fire, the judge stated:

> I think the . . . defendants', Union Carbide's argument that we can somehow discreetly divide the act that started at its very inception, the fire, and . . . the progress of the fire in the middle flies in the face of the *Haas* [sic] decision.

We agree with the circuit court's reasoning that Coleman's negligence in starting the fire and his negligence

in creating the conditions which caused its spread are not distinguishable under the firefighter's rule. As such, Coleman's negligence in creating the conditions by which the fire spread is irrelevant to the issue of his liability to Hauboldt.

The circuit court did allow Union Carbide to present evidence to support its contention that it had not negligently designed or manufactured the tank. The circuit court allowed the testimony of a number of witnesses concerning the acetylene tank. A Union Carbide employee described the process by which acetylene tanks are inspected, filled and labelled by Union Carbide. The jury also heard testimony from an expert witness about the fusible plugs and how they were designed to operate in the event of a fire. Another expert witness testified that the explosion may have been caused not by any defect in the tank, but by the rapid acceleration of the fire caused by the rupturing of the oxygen tank which caused the acetylene tank to rupture before the fusible plugs could operate properly (i.e., the "hot spot" theory). Other expert witnesses testified about the design of the Union Carbide tank, alternative safety devices that could be used, and the warnings on the tank. The jury heard testimony that the tank was designed not to explode in a fire and testimony that the faulty design was responsible for the explosion. Based on this and other evidence presented at trial, the jury rejected Union Carbide's "hot spot" theory and concluded that the acetylene tank was defective and unreasonably dangerous, and that Union Carbide was negligent in designing or manufacturing it.

The circuit court did not allow testimony as to Coleman's alleged code violations in constructing, maintaining and using his garage. The circuit court limited proof of Coleman's negligence (such as his storing the oxygen

and acetylene tanks too close together), to evidence of his negligence in failing to warn the firefighters, because Coleman was immune from liability for other negligence under the firefighter's rule. The circuit court also refused Union Carbide's special verdict request on the question of Coleman's negligence in designing, constructing, maintaining and heating the garage, and its special verdict request on Coleman's negligence in storing the chemicals and tanks in the garage.

The circuit court, in excluding this evidence, did not frustrate Union Carbide's defense to Hauboldt's charges, nor did it affect Union Carbide's claim for contribution against Coleman. First, the court did not frustrate Union Carbide's defense because the additional evidence went to Coleman's negligence, not to whether the tank was defective. As stated above, the jury heard sufficient testimony about the design of the tank and the "hot spot" theory to determine whether the product was defective. Union Carbide was frustrated in its attempt to show Coleman's negligence in constructing, maintaining and operating the garage, but it was not limited in its defense that the acetylene tank was not defective. Union Carbide was given ample opportunity to present and argue its "hot spot" theory, yet the jury found the tank to be defective.

Additionally, Hauboldt's action was against Union Carbide, not Coleman. Unless Union Carbide could establish that Hauboldt's contributory negligence precluded its liability to him, or that Coleman's negligence was the cause of the explosion and not a defect in the acetylene tank, it was liable to Hauboldt because Hauboldt was not causally negligent.

Second, the prohibited evidence did not affect Union Carbide's claim for contribution against Coleman.

Union Carbide claims that the circuit court hindered its claim for contribution against Coleman by keeping out this evidence, and in failing to include in the special verdict, questions relating to Coleman's causal negligence in constructing, maintaining and storing items in the garage. We have held that in an action for negligence, the jury must be given the opportunity to consider the possible negligence of all persons, whether parties or not, who might have contributed to the total negligence. *Reddington v. Beefeaters Tables, Inc.,* 72 Wis. 2d 119, 125a, 240 N.W.2d 363 (1976); *Connar v. West Shore Equip., Inc.,* 68 Wis. 2d 42, 44–45, 227 N.W.2d 660 (1975).

The reason that the jury should be given an opportunity to consider the negligence of all persons involved is that adding in the causal negligence of the omitted tort-feasor(s) may affect the amount of recovery by the injured party. For example, in *Connar,* an employee of the Druml Company was killed by a piece of heavy equipment during the course of his employment. The widow sued the manufacturer of the equipment (Melroe) and a distributor of the equipment (West Shore) but not the employer Druml, as it was immune from liability under the Worker's Compensation Act. The jury assessed 34 percent negligence to the deceased Connar, 25 percent to West Shore (who was subsequently dismissed), and 41 percent to Melroe. We held that it was prejudicial error not to include Druml because the jury may have apportioned the negligence to the liable party differently had Druml's negligence been considered. *Connar,* 68 Wis. 2d at 46.

In this case, by contrast, the jury was given the opportunity to consider the possibility of Coleman's negligence in assessing Union Carbide's liability. The jury

heard relevant testimony concerning the possibility that the oxygen tank may have created a "hot spot" on the acetylene tank due to its close proximity. Had the jury accepted this theory, it would not have found Union Carbide liable for Hauboldt's injuries. Additional evidence concerning code violations and violations of national standards was irrelevant to Union Carbide's claim that its tank was not defective, because the proximity of the oxygen tank was the basis for its "hot spot" theory. Additionally, since Hauboldt was not found contributorily negligent, he was entitled to full damages from Union Carbide, regardless of the apportionment between Union Carbide and Coleman. This case is distinguishable from *Connar* because in *Connar* the plaintiff's recovery was set off by the deceased's own contributory negligence, and any change in apportionment would also increase or decrease the amount of the plaintiff's set-off. Here, the plaintiff was not contributorily negligent, and any changes in the apportionment would not affect his amount of recovery.

In this case there is no common liability between Union Carbide and Coleman because Coleman was immune under the firefighter's rule, hence Union Carbide had no right to contribution from Coleman for his alleged negligence in constructing and maintaining the garage. *See Mulder v. Acme-Cleveland Corp.,* 95 Wis. 2d 173, 177, 290 N.W.2d 276 (1980). *See also* 339–40 *Prosser & Keeton on Torts,* sec. 50 (5th ed. 1984).[4] Coleman was liable for his "failure to warn" as this conduct was

---

[4]Prosser states: "[t]he contribution defendant must be . . . originally liable to the plaintiff. If there was never any such liability, as where the contribution defendant has the defense of family immunity, assumption of risk, or the application of an automobile guest statute . . . then there is no liability for contribution." *Prosser & Keeton on Torts, supra.*

outside the scope of the firefighter's rule. Any other actions which relate to Coleman's negligence in the construction, maintenance and use of the garage fall within the scope of "starting or failing to curtail" the fire.[5]

■ Union Carbide was only entitled to contribution from Coleman for the 12 percent assessed because of Coleman's failure to warn. Union Carbide was liable to Hauboldt for the full amount of his recovery because it was negligently and strictly liable for manufacturing a defective tank. If Coleman was not immune from liability under the firefighter's rule, he may have been jointly and severally liable to Hauboldt for his negligent construction and maintenance of the garage if it resulted in the starting or contributed to the spread of the fire, and Union Carbide may have been entitled to contribution beyond the 12 percent assessed for Coleman's failure to warn. *See Wisconsin Natural Gas Co. v. Ford, Bacon & Davis Constr. Co.,* 96 Wis. 2d 314, 330–34, 219 N.W.2d 825 (1980) (where this court discussed the doctrine of joint and several liability). Because Coleman is immune under the firefighter's rule, however, Union Carbide is solely liable for all but 12 percent of the award. Because the jury found Hauboldt's injuries to be the result of a defective acetylene tank, evidence beyond that presented

---

[5]In *Clark,* we stated concerning the violation of a safety standard: "[i]n this state the protection of a safety statute or ordinance is extended only to those whom the enactment was intended to protect . . . if it can be shown at trial that firemen are within the scope of protection of the ordinances allegedly violated, then a cause of action for recovery will be stated." *Clark,* 75 Wis. 2d at 299–300. While this language may be applicable if Hauboldt had sued Coleman, Hauboldt has not sought to invoke the protection of any safety statutes or ordinances in this case.

to refute this finding was irrelevant, and the circuit court did not err in refusing to allow it into evidence.

## III.

In analyzing the final issue on interest, the starting point is the language of the applicable statute itself.[6] *State v. Denter,* 121 Wis. 2d 118, 123, 357 N.W.2d 555 (1984). The statute is silent on the question of whether the insurer is entitled to interest on its portion of the judgment. However, Hauboldt argues that "reimbursement" only allows the insurer to recoup its actual payment. The entire section must be considered in its construction, however, and the resolution of this issue cannot be limited to the definition of reimbursement. *See Omernick v. State,* 64 Wis. 2d 6, 218 N.W.2d 734 (1974). The threshold question to be addressed when construing statutes is whether a statutory term is ambiguous. *Standard Theatres, Inc. v. Department of Transp.,* 118 Wis. 2d 730, 740, 349 N.W.2d 661 (1984). When the language of a statute is ambiguous or unclear, the supreme court will examine the scope, subject matter and object of the statute to discern legislative intent. *Pulsfus Poultry Farms, Inc. v. Town of Leeds,* 149 Wis. 2d 797, 804, 440 N.W.2d 329 (1989). Statutory language is deemed ambiguous if reasonable persons could disagree as to its meaning. *State v. Williquette,* 129 Wis. 2d 239, 248, 385 N.W.2d 145 (1986). Because the language of sec. 102.29(1), Stats., does not clearly allow or deny interest to the insurer, reasonable people could disagree as to its meaning.

The statute indicates that Employers is more than just a passive observer to the suit. Employers has a right

---

[6]*See* footnote 3 for text of sec. 102.29(1), Stats.

to bring an action against Union Carbide. Employers must be given reasonable notice and the opportunity to join a claim brought by other parties. Union Carbide's liability is determined as to all parties having a right to make such a claim. Employers was in fact impleaded by Hauboldt as a necessary party to the action, a fact the jury was aware of when it awarded past medical and wage compensation. In essence, Employers was one of the parties for whom judgment was rendered.

Hauboldt also contends that the statutory language, "the *proceeds* of such claim shall be divided" (emphasis added), includes the 12 percent interest, and therefore he is entitled to the interest by virtue of the fact that he is due whatever remains (including interest) after the insurer is reimbursed what it paid. Such a conclusion necessarily relies on the statutes on interest which provide for post-verdict and post-judgment interest. Sections 814.04(4)[7] and 815.05(8),[8] Stats. The language of sec. 102.29(1), Stats., does not independently provide for interest payment, so the interest was awarded pursuant to the general statutes on interest. Additionally, sec. 814.01(1) states: "(1) Except as otherwise provided in this chapter, costs shall be allowed of course to the *plaintiff* upon a recovery" (emphasis added). Employers was a

---

[7]Section 814.04(4), Stats., provides:

**(4)** INTEREST ON VERDICT. Except as provided in s. 807.01(4), if the judgment is for the recovery of money, interest at the rate of 12% per year from the time of verdict, decision or report until judgment is entered shall be computed by the clerk and added to the costs.

[8]Section 815.05(8), Stats., provides:

**(8)** Except as provided in s. 807.01(4), every execution upon a judgment for the recovery of money shall direct the collection of interest at the rate of 12% per year on the amount recovered from the date of the entry thereof until paid.

685

plaintiff in this action. Section 814.04(4) indicates that "interest . . . shall be computed by the clerk and added to costs." Because Employers was a plaintiff entitled to recover money it expended, it was also entitled to interest as part of its costs.

Interest is not a penalty for the wrong, but is instead simply the value of the use of the money. *Nelson v. Travelers Ins. Co.,* 102 Wis. 2d 159, 306 N.W.2d 71 (1981). Hauboldt was not deprived of the use of this money, Employers was. Employers paid the medical expenses and disability compensation after Hauboldt's injury. These were expenses it would not have incurred but for Union Carbide's defective product. Clearly, Union Carbide is obligated to pay 12 percent interest, but this interest should go to the party who was deprived of the use of the money. This is not a penalty to Hauboldt. On the contrary, to pay Hauboldt 12 percent on the money due Employers would award him a windfall for interest on money of which he was not deprived.

Hauboldt argues that since he, rather than Employers, incurred the expense of an attorney to pursue a case which benefitted both him and Employers, he is entitled to the interest for reasons of equity. As compelling as this contention is from an equity standpoint, the question of interest is unrelated to that of attorney compensation. The compensation to Hauboldt's attorney was the result of Hauboldt's contract with his attorney, independent of any action Employers took or could have taken.

The statute contemplates that the employee and insurer will have equal rights in the prosecution of the claim against Union Carbide. Section 102.29(1), Stats. Both have an independent vested interest in the judg-

ment, and both are potentially entitled to attorney fees ("If both the employe or the employe's personal representative or other person entitled to bring action, and the employer or compensation insurer, join in the pressing of said claim and are represented by counsel, the attorneys' fees allowed as a part of the costs of collection shall be, unless otherwise agreed upon, divided between such attorneys as directed by the court . . .." *Id.*). Because interest is not a penalty to the wrongdoer, but rather the value of the use of the money, Employers should recover the 12 percent interest awarded. There is no indication that the legislature intended to enrich Hauboldt by paying him interest on money that was not his. On the contrary, since Employers was a party to a money judgment, it is entitled to interest on the money it was due from the date of the verdict. Sections 814.04(4) and 815.05(8), Stats.

In summary, we first conclude that the firefighter's rule does not include within its scope the manufacturers of a defective product which injures a firefighter during the course of a fire, rather than starting or contributing to the spread of the fire, when the danger caused by the defective product is not reasonably apparent to the firefighter, or anticipated by the firefighter. Second, we conclude that the circuit court did not err by refusing to allow additional testimony and a special verdict concerning Coleman's negligence, because the testimony and special verdict went to the issue of Coleman's negligence in starting or failing to curtail the start of the fire. It did not go to the issue of whether Union Carbide's acetylene tank was defective, and sufficient evidence was presented at trial to allow the jury to decide that issue. Finally, we conclude that the circuit court did not err when it awarded 12 percent interest to Employers on the amount due Employers as reimbursement under sec.

102.29(1), Stats. Employers was a party to the action and entitled to 12 percent interest since it was deprived of the use of its money.

*By the Court.*—Judgment of the circuit court is affirmed.